IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 2, 2026

## IN RE ELLIOT S.

**Appeal from the Juvenile Court for Hawkins County**
**No. HJ-24-0816      Amy Skelton, Judge**

_____

### No. E2025-00852-COA-R3-PT

_____

A mother appeals the termination of her parental rights to her child. Because the Department of Children's Services declined to defend one ground, we reverse that ground. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KRISTI M. DAVIS, J., joined.

Cameron L. Hyder, Johnson City, Tennessee, for the appellant, Emily S.

Jonathan Skrmetti, Attorney General and Reporter, Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

In this case, we determine whether the juvenile court properly terminated Emily S.'s ("Mother's") parental rights to her child, Elliot S. ("the child") (born in 2017).[1] In December 2024, the Tennessee Department of Children's Services ("DCS" or "the Department") filed a petition to terminate Mother's parental rights in the Juvenile Court for Hawkins County. In the petition, DCS alleged that the child had been in DCS's custody since April 2023 and had been adjudicated dependent and neglected in September 2023. The petition also alleged that Mother was incarcerated for all or part of the four months preceding the filing of the petition. As grounds for termination, the petition alleged

_____

[1] This appeal concerns only Mother's rights. The identity of the child's father is unknown.

abandonment, failure to manifest an ability and willingness to assume custody, and substantial noncompliance with the permanency plans. The petition also alleged that termination was in the child's best interests.

The trial on the petition was held on March 18, 2025. Those present at the hearing were DCS's counsel, Mother's appointed counsel, the child's guardian ad litem, and two assigned case workers, Sreyroth Weaner and Patty Kline. The child's foster mother was also present by telephone. Mother, however, was not present at the hearing. Because Mother was not present, her counsel moved for a continuance, which DCS opposed as there was no indication that Mother was prevented from attending the hearing. The guardian ad litem pointed out that Mother was present at the previous hearing when the date and time of the final hearing were set, and Mother's counsel stated that he had spoken with Mother the day before and that she had said she would be present. Because there was no indication that Mother was prevented from attending the hearing, the court denied the continuance, and the trial proceeded.

The evidence at the trial consisted of the testimony of two witnesses and numerous exhibits. The first witness to testify was Ms. Kline, an in-home worker assigned to the case, who testified that she began working with Mother in January 2025 and had assisted Mother in finding housing and provided Mother with parenting classes. Ms. Kline testified that she initially had difficulty reaching Mother because Mother would not return her calls or messages, but Mother eventually responded. Mother did not have housing when Ms. Kline began working with her, but Mother was employed. Ms. Kline began assisting Mother in finding housing but did not know whether Mother followed through with the assistance provided. As to Mother's housing, Ms. Kline testified that, to her knowledge, Mother did not have stable housing and that she was staying "in a place in Johnson City where there's other women. I think it's one of those places you have to check in." Ms. Kline testified that she had given Mother parenting classes and was helping Mother prepare to resume visitation and that Mother was receptive to these classes and did well in them. Ms. Kline testified that Mother had completed the classes the previous week. Ms. Kline testified that there had been one visit with the child up to that point; however, she did not know whether Mother had provided any support to the child.

Ms. Weaner, the DCS caseworker assigned to the case, testified next. The child's father was unknown, and no father was on the child's birth certificate. Also, the putative father registry returned no results. Ms. Weaner detailed the circumstances surrounding how the child came into DCS's custody. Mother had left the child with a partner without indicating when she would return, so that partner filed for custody. However, after the partner conducted a DNA test that showed he was not the father, he contacted DCS, which was granted custody in April 2023. Ms. Weaner testified that Mother was incarcerated from August to September 12, 2024, and that Mother had not visited the child in the four months preceding her incarceration. Ms. Weaner also testified that Mother did not pay any support to the child during that period, did not have housing, and did not complete items on her

permanency plan. Ms. Weaner testified that, in her opinion, Mother only began taking steps to assume custody after the petition was filed. Ms. Weaner also testified that the child had various special needs and was bonded with his foster family.[2]

On April 1, 2025, the juvenile court entered an order terminating Mother's rights to the child. The court found that Mother was incarcerated from August 14, 2024, to September 12, 2024. The court found that Mother did not visit the child during the four months preceding her incarceration. As a condition of resuming visitation with the child, Mother was required to pass two drug screens, which she did not do, and this prevented Mother from visiting the child. Further, the court found that Mother had failed to pay any support to the child during that period and had exhibited a wanton disregard for the child's welfare. The court found DCS had also proven the grounds of substantial noncompliance and failure to manifest an ability and willingness to assume custody of the child. The court then analyzed the statutory list of best interest factors and determined that the termination of Mother's parental rights was in the child's best interest. Therefore, the court entered an order terminating Mother's parental rights and appointing DCS as the child's legal guardian.

Three days later, Mother filed a "motion for rehearing," asking the court to set aside the judgment and to rehear the matter. The motion asserted that Mother missed the hearing due to excusable neglect. The court held a hearing on the motion on May 7, 2025, and on July 18, 2025, filed an order denying the motion, finding that Mother missed the hearing based on her mistaken belief regarding the start time of the hearing, that Mother was present at the prior hearing at which the date and time of the hearing was set, and that Mother's "carelessness and nothing more" was not a basis for relief. Therefore, the court denied the motion. Mother appealed and presents the following issues:

1. Whether the Juvenile Court abused its discretion in denying Mother's Motion for Rehearing where her failure to appear at the termination hearing was the result of mistake, inadvertence, or excusable neglect.
2. Whether terminating Mother's parental rights in her absence violated her constitutional right to due process.
3. Whether the Department of Children's Services proved the statutory grounds for termination by clear and convincing evidence.
4. Whether the Department of Children's Services proved by clear and convincing evidence that termination of Mother's parental rights was in the child's best interest.

---

[2] During Ms. Weaner's testimony, Mother's counsel informed the court that Mother had contacted him and that she believed the trial was at 1:00 PM, not 9:00 AM, which was the reason for her absence. The court stated that Mother could attempt to attend the trial before its conclusion, but the trial would continue as scheduled.

STANDARD OF REVIEW

Our state's Supreme Court has recognized "that both the United States and Tennessee Constitutions protect parents' rights to the custody and care of their children." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This right is "'far more precious than any property right.'" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). Parents may forfeit their rights to the care and custody of their child by engaging in conduct that substantially harms the child, and, in such cases, the state may initiate proceedings to terminate the parents' rights. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). To terminate a parent's rights, clear and convincing evidence must be shown that grounds for termination exist and that termination of the parent's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In cases such as the present matter, where the court conducts a trial sitting without a jury, we review the court's findings of fact de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). In parental termination cases, "the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. The burden is on the petitioning party to show clear and convincing evidence regarding both requirements of the termination statute. *In re Angela E.*, 303 S.W.3d at 250. "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

ANALYSIS

I. Mother's absence from the hearing

Mother's first two issues concern her absence from the trial on the petition. Mother argues that the juvenile court erred by denying her motion for rehearing and by holding the hearing in her absence. We find her argument as to both issues unavailing. Tennessee's Rules of Civil Procedure do not contemplate motions for rehearing; however, courts consider these motions to be, in essence, motions to alter or amend a judgment pursuant to Tenn. R. Civ. P. 59. *Johnson v. Johnson*, No. M2008-00236-COA-R3-CV, 2009 WL 890893, at *12 (Tenn. Ct. App. Apr. 2, 2009) (citing *State ex rel. Turner v. Bryant*, No. W2006-01463-COA-R3-JV, 2008 WL 2388630, at *4 (Tenn. Ct. App. June 12, 2008)).

We review a court's decision on whether to grant a Rule 59 motion under the abuse of discretion standard. *Ferguson v. Brown*, 291 S.W.3d 381, 386 (Tenn. Ct. App. 2008). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

Mother asserts that her absence was due to excusable neglect and that the juvenile court's failure to amend the judgment for this reason constituted an abuse of discretion. We disagree. A Rule 59 motion's purpose is to afford the trial court with an opportunity to correct errors before the judgment becomes final and "should be granted when the controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). Mother failed to show that granting her motion would have served any of these purposes.

Mother asserts that the trial continuing in her absence violated her constitutional rights. This Court has previously rejected the assertion that a parent's absence from a termination trial, without more, constitutes a reason to set aside the termination of the parent's rights. *See In re Arianna B.*, 618 S.W.3d 47, 60-61 (Tenn. Ct. App. 2020) (concluding a mother was not deprived of fair procedures when she was absent from the last day of a termination hearing when there was no indication she was "prevented from attending or lacked notice"); *see also In re Gabriella H.*, No. M2018-00723-COA-R3-PT, 2019 WL 126996, at *8 (Tenn. Ct. App. Jan. 8, 2019) (quoting *State, Dep't of Children's Servs. v. T.P.H.R.*, No. E2006-02670-COA-R3-PT, 2007 WL 2080939, at *7 (Tenn. Ct. App. July 20, 2007)) ("Mother argues that the trial court erred by terminating her parental rights when she was not present at trial. We find this argument lacks merit. In fact, we have previously addressed an appeal of a termination of parental rights in which we found that a juvenile court 'acted within its authority when it proceeded to conduct the trial even though Mother was not present.'").

Mother's proffered reason for her absence was her mistaken belief about the time of the trial, and she does not assert that she was prevented from attending the trial by any force beyond her control. Further, Mother was present at the hearing at which the trial's date and time were set. Counsel represented Mother throughout the trial and actively participated in it. We do not conclude that Mother's rights were violated. Nor do we conclude that the juvenile court erred by denying her motion to alter or amend the judgment. Therefore, we find no abuse of discretion.

## II. Grounds for termination

The juvenile court found that three grounds existed for terminating Mother's parental rights: abandonment, substantial noncompliance with permanency plans, and

failure to manifest an ability and willingness to assume custody. In its brief, the Department concedes that the ground of substantial noncompliance was not sufficiently proven and declines to defend that ground. We have previously summarily reversed a ground for termination without reaching the merits of that ground when the petitioner concedes that the ground was not sufficiently proven, and we do so here. *See In re Jaylan J.*, No. W2019-02025-COA-R3-PT, 2020 WL 7861378, at *12 (Tenn. Ct. App. Dec. 22, 2020) (collecting cases). We, therefore, reverse that ground and will only address the merits of the remaining grounds found by the juvenile court.

## A. Abandonment

The juvenile court found that Mother had abandoned the child under several definitions of the term: by failing to support the child, failing to visit the child, and showing a wanton disregard for the child's welfare. Mother asserts the evidence presented at the trial did not amount to clear and convincing evidence of this ground. We disagree and conclude that clear and convincing evidence supported the court's findings.

Tennessee Code Annotated section 36-1-113(g)(1) provides a parent's rights may be terminated if the parent abandons his or her child as defined in Tenn. Code Ann. § 36-1-102. As relevant here, Tenn. Code Ann. § 36-1-102(1)(A)(iv) defines abandonment thusly:

> (1)(A) For purposes of terminating the parental . . . rights of a parent . . . to that child in order to make that child available for adoption, "abandonment" means that:
> > (iv) A parent . . . has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more . . . and has:
> > > (*a*)(*1*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's . . . incarceration if the child is four (4) years of age or more; or
> > > . . .
> > > (*c*) With knowledge of the existence of the . . . child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[3] This definition of abandonment applies when a parent "is incarcerated at or near the time of the filing of the termination petition." *In re Audrey S.*, 182 S.W.3d 838, 865 (Tenn. Ct. App. 2005). Here, the child was over four years of age when DCS filed the petition to terminate Mother's rights on December 10, 2024.

---

[3] We apply the version of the statute in effect at the time of the filing of the petition.

Mother was incarcerated from August 14, 2024, to September 12, 2024, which was during part of the four months immediately preceding the filing of the termination petition, making the relevant four-month period April 14, 2024, to August 13, 2024. *See In re Braxton M.*, 531 S.W.3d 708, 720 (Tenn. Ct. App. 2017).[4]

The juvenile court found that Mother had not visited the child during the four months preceding her incarceration. Failure to visit is defined in the statute as "the failure, for the applicable time period, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The evidence introduced at trial showed that Mother did not visit the child at all during the relevant period. As a condition of resuming visits with the child, Mother was required to return negative results on two drug screens, which she did not do. Although Mother returned one negative drug screen, she also returned positive results for buprenorphine and amphetamines during the four months preceding her incarceration. "'This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit.'" *In re Ethan W.*, No. E2024-00318-COA-R3-PT, 2024 WL 4600451, at *6 (Tenn. Ct. App. Oct. 29, 2024) (quoting *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at *6 (Tenn. Ct. App. June 30, 2014)); *see also In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010) ("A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child."). Therefore, we agree with the juvenile court that the evidence supported a finding of abandonment by failure to visit.

The juvenile court also found that Mother failed to support the child during the relevant period. A parent "failed to support" or "make reasonable payments toward such child's support" when the parent failed to provide "monetary support" or "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). The evidence introduced at trial showed that, although Mother was sporadically employed during the relevant period, she failed to provide any support to the child. A parent's failure to pay any support during the period constitutes abandonment by failure to support. *See In re Brittany W.*, No. E2020-01631-COA-R3-PT, 2021 WL 2337147, at *8 (Tenn. Ct. App. June 8, 2021). We agree with the juvenile court that Mother abandoned the child by failing to support the child.

Finally, the juvenile court found that Mother abandoned the child by engaging in conduct showing a wanton disregard for the child's welfare. Under this definition, a parent's incarceration "serves only as a triggering mechanism," which causes a court to

---

[4] The juvenile court slightly erred by finding the relevant four-month period to be April 13, 2024, to August 13, 2024. This one-day difference does not affect our review of the case. *See In re Braxton M.*, 531 S.W.3d at 720.

"take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. This definition of abandonment does not share the same temporal limitation as those previously discussed. *Id.* at 871. As we have previously explained:

> Although Tenn. Code Ann. § 36–1–102(1)(A)(iv) does not specifically define "wanton disregard," Tennessee courts have held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68; *see also In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse."); *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005) (quoting *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005)) ("[A]n incarcerated parent who has multiple drug offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and reincarceration, constitutes abandonment of the child, and demonstrates a wanton disregard for the welfare of the child.")

*In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *2 (Tenn. Ct. App. June 9, 2015). The evidence in the record supports the juvenile court's finding that Mother engaged in conduct showing a wanton disregard for the child's welfare. Throughout the custodial period, Mother continued to return positive results on drug screens and subsequently began refusing to complete additional screens. Mother's drug use ultimately resulted in two incarcerations. Only after the termination petition was filed did Mother return a negative drug screen. Prior to her incarceration, Mother lacked housing and did not show that she had stable housing by the time of trial. Mother's behavior, therefore, shows a wanton disregard for the welfare of the child. *See In re Lay'la R.*, No. W2025-00272-COA-R3-PT, 2025 WL 2962661, at *8 (Tenn. Ct. App. Oct. 21, 2025) (determining that a father showed a wanton disregard for the child's welfare due to his incarceration, refusal to submit to a drug screen so that he could exercise visitation, and by not providing any financial support for the child).

### B. Ability and Willingness

The juvenile court also found that DCS had proven the ground commonly referred to as "ability and willingness," which provides that termination may be based upon a finding that the "parent . . . has failed to manifest . . . an ability and willingness to personally assume legal and physical custody or financial responsibility of the child" and that "placing

the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing evidence of two elements: (1) the parent has failed to manifest an ability or willingness to assume custody of or financial responsibility for the child, and (2) returning the child to the parent's custody creates a risk of substantial harm to the physical or psychological welfare of the child. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Under the first element, proof that the parent failed to manifest either an ability or a willingness is sufficient. *Id.* at 677. When looking at a parent's conduct, "'[a]bility focuses on the parent's lifestyle and circumstances,' while willingness revolves around a parent's attempts 'to overcome the obstacles' preventing the parent from assuming custody." *In re Chayson D.*, 720 S.W.3d 123, 141 (Tenn. Ct. App. 2023) (quoting *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019)). Mother failed to provide any support to the child whatsoever and, as the juvenile court found, Mother only had one visit with the child after he entered DCS's custody—a nearly two-year period. Mother did not engage with DCS or the juvenile court to pursue regaining custody, and the juvenile court found that Mother had, at times, blocked communications from the caseworker to avoid contact with her. The court similarly found that Mother had "barely completed any tasks on her permanency plan." Most of the tasks Mother had completed she did not begin until after the termination petition was filed. Mother also lacked suitable housing and used illicit drugs throughout the child's time in DCS's custody, which resulted in two incarcerations. Although Ms. Kline testified that Mother completed the parenting and homemaking courses offered, Mother did not follow her recommendations or meaningfully engage with the services offered in a manner that showed she was making an attempt to overcome the obstacles preventing reunification. We agree with the juvenile court that Mother failed to manifest an ability and willingness to assume custody of or financial responsibility for the child.

The second prong looks to whether "placing the child in the parent's custody poses 'a risk of substantial harm to the physical or psychological welfare of the child.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). The risk of harm under the second element must be real and not "minor, trivial, or insignificant." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). The harm must be more than theoretical but does not need to be inevitable. *Id.* All that is necessary is that the harm "be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Id.* The record contains clear and convincing evidence to support the juvenile court's finding that placing the child in Mother's custody would pose a risk of substantial harm to him. Mother's lack of housing, drug use, and lack of a relationship with the child would each pose a risk of substantial harm to him. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (collecting cases). This is heightened by the fact that Elliot has special needs and that Mother had not demonstrated she understood or could provide care for these special needs. The child's foster family, with whom he was

bonded, had shown the ability to care for his special needs. Removing Elliot from his foster family and placing him with Mother would create a risk of substantial harm. *See In re Elizabeth Y.*, No. E2023-01448-COA-R3-PT, 2024 WL 3738701, at *6 (Tenn. Ct. App. Aug. 9, 2024) (affirming this ground when the child was bonded to her foster family, the foster family was meeting her special needs, and she had no relationship with the parent). We, therefore, conclude that DCS proved this ground by clear and convincing evidence.

## III. Best interests

After a court finds that a ground for termination exists, it next turns to whether terminating the parent's right is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254.

Our termination statutes recognize that not all parental misconduct is irredeemable—meaning that termination of an unfit parent's rights is not always in the child's best interests. *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). In the best interests inquiry, the child's best interests diverge from those of the parent, and courts focus on the child's best interests, as viewed from his or her perspective. *In re Audrey S.*, 182 S.W.3d at 877-78. Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

When a court is considering whether termination is in the child's best interests, it must consider the non-exclusive list of factors enumerated in Tenn. Code Ann. § 36-1-113(i). *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *Id.* at 682. To ensure that every parent receives the individualized consideration to which they are entitled, "the best interests analysis is and must remain a factually intensive undertaking." *Id.* Any single factor may dictate the outcome of the analysis, *In re Audrey S.*, 182 S.W.3d at 878, but courts must always consider all of the factors and all relevant proof. *In re Gabriella D.*, 531 S.W.3d at 682.

We first examine the group of factors that relate to the child's social and emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (D). The child had been in the same foster home for approximately fourteen months at the time of the trial, and this was his pre-adoptive home. Termination would allow the child to remain in this home permanently, which would positively impact his need for stability and continuity of placement. Similarly, because his foster home was his pre-adoptive placement, a change of caretakers and his

physical environment would have a detrimental effect on him, as he was in a home offering stability, safety, and permanency. Additionally, the caseworker testified that it was her opinion that the child would struggle if he were separated from his foster mother. The child has special needs and was bonded to his foster mother. Mother would likely be unable to care for the child's special needs, in light of her own struggles. *See id.* § 36-1-113(i)(1)(A), (B) (addressing "[t]he effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority," and "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition[s]."). The child's relationship with his foster mother stands in stark contrast to his almost nonexistent relationship with Mother, who only visited him one time during his time in DCS's custody. *See id.* § 36-1-113(i)(1)(D) ("Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment."). We agree with the juvenile court that these factors weighed in favor of termination.

We next consider the factors related to Mother's behavior towards the child. *See id.* § 36-1-113(i)(1)(E), (N), (S). Mother only had one visit with the child during the nearly two years he was in DCS's custody. Her failure to visit more was due to her inability to provide two negative drug screens, as required for her to resume visitation. Mother's incarceration also negatively affected her ability to visit with the child. *See id.* § 36-1-113(i)(1)(E) (addressing "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child"). Mother also failed to provide any support to the child. *See id.* § 36-1-113(i)(1)(S) (addressing "[w]hether the parent has consistently provided more than token financial support for the child"). The juvenile court also found that Mother had shown neglect towards the child and that Mother had used drugs while pregnant with him.[5] *See id.* § 36-1-113(i)(1)(N) ("Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult."). We agree that these factors weighed in favor of termination.

The next group of factors considers the efforts the parent has made to improve their conduct or the situation that led to removal. *See id.* § 36-1-13(i)(1)(J)-(M). The juvenile court found that Mother did not show a sense of urgency in remedying the conditions that led to removal because she only began making efforts toward her permanency plan action

---

[5] In analyzing factor (N), the juvenile court found that the child had been diagnosed with Neonatal Abstinence Syndrome due to Mother's drug use while pregnant with the child. This finding does not appear to be supported by the record. In a mental health assessment included in the record, Mother does acknowledge that Elliot was in a NICU for seventeen days after his birth due to her use of Subutex while pregnant. However, evidence of a diagnosis is not included in the record. The Department makes no mention of this diagnosis in its brief to this Court. We conclude that the record does not support this factual finding.

- 11 -

steps once the petition to terminate her rights was filed. While Ms. Kline testified that Mother was receptive to parenting and homemaking classes, it does not appear that Mother actually implemented what she learned, as she never provided proof of stable housing, despite Ms. Kline's efforts to assist her in finding suitable housing. Similarly, Mother only began utilizing the services offered to her after the petition was filed. *See id.* § 36-1-113(i)(1)(M), (K) (addressing "[w]hether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest" and "[w]hether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions"). The court also found that DCS had made reasonable efforts to assist Mother, but that Mother had not utilized those efforts and had blocked the caseworker's telephone number and misrepresented her housing arrangements. We agree that DCS made reasonable efforts to help Mother adjust her circumstances. *See id.* § 36-1-113(i)(1)(L) ("Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department.").

Further, Mother did not show a lasting adjustment of her circumstances, conduct, or conditions such that it would be safe or beneficial for the child to be reunited with her. Mother did not show that she had stable housing or provide any proof to DCS regarding her living arrangements. Mother was also unable to consistently show that she was able to abstain from continued drug use. *See id.* § 36-1-113(i)(1)(J) ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner."). Although Mother returned one negative drug screen, this does not support a finding that she would be able to maintain long-term sobriety. These factors weigh in favor of termination.

The next group of factors concerns the parent's ability to provide care for the child. *See id.* § 36-1-113(i)(1)(C), (O), (P), (Q). The evidence regarding these factors shows that Mother was not in a position to provide care for the child. No evidence was introduced at the trial that Mother ever provided safe and stable care for the child or any other child. To the contrary, evidence was introduced that Mother, through her drug use and the circumstances in existence when the child entered DCS's custody, had not provided adequate care to the child. *See id.* § 36-1-113(i)(1)(O) (addressing "[w]hether the parent has ever provided safe and stable care for the child or any other child").

Similarly, Mother never demonstrated an understanding of the child's basic and specific needs as she had not been involved in the child's care for nearly two years and prior to the child's removal from her custody, she did not provide adequate care to him. She also did not demonstrate the ability and commitment to creating and maintaining a

- 12 -

home, as she never provided proof of her housing to DCS. *See id.* § 36-1-113(i)(1)(P), (Q) (addressing "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive," and "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive"). Mother had not demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs because she had not provided any care for the child for several years at the time of the trial. She did not provide any evidence to DCS or at trial that she had obtained and maintained independent, safe housing for herself and the child. Through Mother's drug use and incarceration, she did not demonstrate continuity or stability. *See id.* § 36-1-113 (i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs."). Therefore, we agree with the juvenile court that these factors weigh in favor of termination.

The juvenile court also found that factor (T), regarding whether Mother's mental or emotional fitness would be detrimental to the child, also weighed in favor of termination. *See id.* § 36-1-113(i)(1)(T). The evidence does not support this conclusion. The court found that Mother's failure to promptly address the reasons for the child's removal showed that her mental and emotional fitness would hinder her from providing safe and stable care for the child. We disagree with this assessment of the evidence, especially in light of the minimal evidence concerning Mother's actual mental state. Further, the evidence in the record that might reasonably go towards this factor—Mother's interactions with Ms. Kline—would weigh against this finding, as Ms. Kline testified that Mother did well in the parenting classes and was receptive to the classes. We find that this factor weighed against termination.

The remaining factors primarily concern Mother's home environment.[6] Regarding factor (R), the juvenile court found that no testimony was given regarding the appropriateness of Mother's home, and that this factor weighed in favor of termination. *See id.* § 36-1-113(i)(1)(R) (addressing "[w]hether the physical environment of the parent's home is healthy and safe for the child"). The evidence in the record showed that Mother was often without housing or, as phrased by the DCS caseworker, lived "on the streets." Further, to the DCS caseworker's knowledge, at the time of the trial Mother was residing in a place with other women where "you had to check in." We agree that this factor favors termination.

Although some factors weighed against termination, we conclude that, when considered as a whole, termination was in the child's best interests. Mother did not

---

[6] The juvenile court found that two factors were inapplicable, Tenn. Code Ann. § 36-1-113(i)(1)(F), (G) (addressing "[w]hether the child is fearful of living in the parent's home," and "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms").

- 13 -

demonstrate to the Department or the court that she had suitable housing or that she could provide care for the child. Mother's persistent drug usage, which resulted in her incarceration, similarly shows that termination is in the child's best interests. Finally, Elliot is in a stable, and by all accounts, loving pre-adoptive foster home that meets his needs. Therefore, we affirm.

CONCLUSION

We reverse the finding of substantial noncompliance and affirm in all other respects. Costs of this appeal are assessed against the appellant, Emily S., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE